46 So.2d 571

## CLOUD v. STATE.

### 8 Div. 782.

Court of Appeals of Alabama.
May 9, 1950.

Rehearing Denied May 23, 1950.

Griffin, Ford, Caldwell & Ford, of Huntsville, and Proctor & Snodgrass, of Scottsboro, for appellant.

A. A. Carmichael, Atty. Gen., and Alfred W. Goldthwaite, Asst. Atty. Gen., for the State.

BRICKEN, Presiding Judge.

The indictment in this case charged murder in the second degree. It contained one count only, which reads as follows:

"Indictment

| "The State of Alabama. | "Circuit Court, |
| "Jackson County | Spring Term, 1948. |

"The Grand Jury of Said County charge that before the finding of this indictment R. B. Cloud and Clyde Nelson Payne, whose names to the Grand Jury are otherwise unknown than as stated, unlawfully and with malice aforethought killed John L. Woody by pushing or throwing him into a river whereby he was drowned, but without premeditation or deliberation, against the peace and dignity of the State of Alabama."

A severance was granted and this appellant was put upon trial. He interposed his plea of "not guilty." This plea, of course, formulated the material issues in the case and placed upon the State the burden of proof to show by the evidence beyond a reasonable doubt, and to a moral certainty, that the accused had committed the specific charge contained in the indictment, that is to say, that the State had the burden in this case, to show beyond a reasonable doubt that the defendant killed the deceased named in the indictment *"by pushing or throwing him into a river whereby he was drowned."*

As properly stated by the trial court in the oral charge to the jury: "When the State charges the killing of a person in a certain way, or mode, then the State is bound to prove that beyond a reasonable doubt in order for the defendant to be convicted. In this case the State has charged that defendant here, and Clyde Nelson Payne, who is not on trial, killed the deceased person, John L. Woody, by pushing or throwing him into a river whereby he was drowned, but without premeditation or deliberation."

This case has been considered and decided by the court sitting en banc.

The principal and controlling question presented for our consideration is whether, or not, the evidence was sufficient to establish the corpus delicti.

After a careful and thoughtful consideration of this question, we perforce must, and do hold that there was not sufficient legal evidence adduced upon the trial to prove the corpus delicti of the crime, as charged in the single count of the indictment.

Upon the trial of this case there was no dispute or conflict in the evidence that the deceased named in the indictment, on the occasion in question, had been killed. But the defendant throughout the trial insisted that the evidence failed to show that his death was due to his having been drowned, as the indictment charged. This contention was, and is, presented in every conceivable manner.

The evidence introduced at the time of the trial shows that on the afternoon of Sunday, March 16, 1947, the body of a man was sighted floating on the Tennessee River in Jackon County, Alabama, by some fishermen. While the corpse was still in the water, it was identified as being the body of John L. Woody, the deceased named in the indictment.

The State introduced several witnesses to relate what happened on the day of the slaying, the events leading up to the finding of the body, and the circumstances after the slaying.

State witness, Will Woody, brother of the deceased, testified that he found blood and short gray hair on a blanket in his brother's tent the day after the murder,

and that, in his best judgment the hair was that of his deceased brother.

State witness, Eddie Smoot, a fisherman and musseler, testified that on the Saturday before the slaying he was at the camp with the deceased, the accused, and Clyde Payne, a co-defendant in the case, and that they were all drinking. He testified that the appellant and the deceased had an argument the next day between twelve and one o'clock, and that the accused hit the deceased a barehanded lick and knocked him back into the tent. His testimony further showed that he, witness, left about one o'clock.

State witness, William Yates, an undertaker and mortician, testified that when he prepared the deceased for burial he found that his nose had been broken, and observed bruises on his face and a gash on the back of his head about two or three inches long.

State witness, J. F. Henshaw, coroner of Jackson County, testified that when he examined the body of the deceased he observed many scratches over his face and on the base of his nose, and that in his judgment the nose had been broken. He also observed that one eye had suffered a severe lick. He testified further that in his judgment the deceased had been hit and thrown in the water.

State witness, Jess Privett, a fisherman, testified that on the day of the murder, while he was fishing with others on the Tennessee River, he observed at a distance of about seventy-five yards a motor boat in which Clyde Payne was seated and the accused was standing. He testified that approximately ten minutes later he and the others saw the body of deceased floating down the river. His testimony showed that, after he and the others attempted to get the body out with rods and reels, he, along with two others, went to the camp of Clyde Payne and the accused to borrow a boat. There they found the accused and Payne inside of the tent. The appellant, when asked for the use of his boat, stated: "I don't know whether the motor will run or not. It ain't been cranked in a week." Privett identified this boat as the one he

had seen on the river ten minutes previously. His testimony further showed that when they approached the body of the deceased which was still floating on the river, the accused identified the body as that of John Woody and immediately thereafter put his face in his hands so as to cover up his eyes.

The testimony of the several State witnesses who saw and examined the dead body of the deceased all tended to show that he had been severely beaten; that there was a large contusion over his left eye as from a heavy blow; that his nose was crushed and broken, and an apparently heavy blow on the base of skull had caused a gash or contusion upon his head. That his face was scratched in many places, etc. As to the foregoing there was no dispute or conflict.

William Yates, being sworn, testified for the State:

"Q. You are William Yates? A. Yes, sir.

"Q. You are an undertaker here? A. Yes, sir.

"Q. Mortician? A. Yes.

"Q. Were you an undertaker in March, 1947? A. Yes.

"Q. Do you remember preparing the body of John Woody for burial? A. Yes.

"Q. Just tell the jury in your own words whether or not he had wounds about his body and if so where they were and what the nature was of those. A. There was a gash in the back of his head about two inches long or more. His nose was broken and a few little scratched places on his head and bruises on his face.

"Q. Was the skin broken on his nose where he was struck? A. Yes."

The only witness examined by the State who undertook to testify as to what caused the death of deceased was said J. F. Henshaw. He testified that he was an undertaker and had been for twenty-five or thirty years. He also testified that he was the coroner of the county. That he went down to the river and took charge of the body of the deceased. And in answer to

the question: "Just tell the jury, if you will, what you found up there when you went to take charge of that body." He answered: "We went there and found this body tied to a limb a short distance above the boat landing. We untied the body and brought it from the side of the boat to land and lifted it out to the bank."

We here quote from the record further questions propounded to this witness, and his answers:

"Q. What was the condition of that body with reference to lacerations and torn parts? A. Quite a few scratches over the face and the base of the nose. Quite a lick at the base of the nose and around the left eye; I believe it was the left eye. One of them. Maybe a contusion over here near the eye and general scratches about the face and small bruises.

"Q. Any broken places in the flesh? A. Yes.

"Q. Where were those? A. At the base of the nose.

"Q. You say his nose was broken? A. I would not know definitely about that. I would guess that it was.

"Q. Is that your best judgment? A. Yes, in my best judgment it was broken.

"Q. Did you examine his lungs? A. What do you mean by examination?

"Q. Did you try to determine there in your examination of this body whether or not there was water in the lungs? A. Did not get any excess water from the body in the embalming operation. There is generally some water accumulated in the lungs, liquid.

"Q. Of dead persons? A. Yes, and on drowning they will take more water, you will find an excess amount of water there.

"Q. Did you, or did you at the inquest, perform an autopsy? A. No.

"Q. I believe that you testified that you embalmed the body? A. Yes.

"Q. Embalming fluid goes through the veins? A. Goes through the arteries.

"Q. Blood vessels of the body? A. Yes.

"Q. Does that go into the lungs at all? A. Yes, it does to some extent, through the tissues.

"Q. It does not force any liquids in the lungs out of the lungs? A. That is a little too technical. I don't know about that.

"Q. If the lungs had been punctured then liquid would be forced out? A. Under some conditions, yes.

"Q. You did not examine the lungs, take the lungs out of the body? A. We did not autopsy the body.

"Q. What is the common test to determine the cause of death by drowning? A. You could autopsy to see that the water is in the lungs.

"Q. You take the lungs out? A. Not necessarily.

"Q. Isn't it true that as a rule in order to determine whether or not a man has drowned you take the lungs out and set them in water, if the lung sinks down there has been drowning and there is water in the lungs, and if it does not sink then the man did not drown? A. I have not gone into it that deep.

"Q. You do not know what the common test for drowning is? A. As to determining the water in the lungs but how to determine it I don't know.

"Q. You said on embalming the body there was no excess water? A. We did not get any excess.

"Q. If death is by drowning there is excess water in the lungs? A. That is my understanding.

"Q. And you found no excess? A. That is right.

"Q. Assuming that it was a two inch laceration on the back of his head and that laceration was a deep laceration, would you tell this jury whether or not the blow causing that laceration could cause a basal fracture? A. I would say that it was possible.

"Q. And if it had caused a basal fracture is it possible that the lick causing the basal fracture would have caused death? A. Yes, it is possible.

"Q. Will you tell the jury about what there was about the body that indicated the cause of death, if anything? A. I gave you my opinion on that awhile ago.

"Q. I am asking you what was there about the body, on the body, if anything, to indicate the cause of death? A. The scratches and bruises I have told you about and the fact we got him out of the water and those licks on the head and the fact we got him out of the water was evidence of death.

"Q. But nothing definitely to indicate the cause of death? A. I gave my opinion on that awhile ago.

"Q. But the fact that the body was in the water at that time did not indicate that the man had drowned? A. Maybe not.

"Q. You have to examine the lungs to determine whether or not drowning— A. Yes, I would say you do have to find water in the lungs.

"Q. Nothing about the body at the time you got there to determine the man was or was not dead at the time he went into or was put into the water? A. As far as I know there wasn't at that time."

On redirect examination by the State this witness further testified:

"Q. You testified on a hypothetical proposition propounded to you about a two inch gash on the back of the head. I would like to ask you if that was a two inch cut made by a knife or some other instrument if that would cause a basal fracture? A. A cut would not.

"Q. If there was no basal fracture then that cut would not have produced death? A. I don't think so.

"Q. But if caused by a blunt instrument rather than a sharp instrument it could cause a basal fracture that would cause death? A. If it was a lick but if it was a cut with a knife it would not do it. That is a little to technical for me.

"Q. A blunt instrument could cause a laceration also? A. Yes.

"Q. I believe you testified you don't remember whether or not there was a two inch laceration on the back of the head?

A. I don't know how big it was. I did not measure it.

"Q. If there was a two inch laceration here caused by a blunt instrument then that could have caused or resulted in death? A. I think I answered that awhile ago.

"Q. Will you answer it now? A. That would all depend. If the lick was heavy enough it would. If not, it would not.

"Q. If it caused a basal fracture it would? A. And would have to be a heavy lick to cause a fracture there in my judgment.

"Q. You testified there was a blow on the nose? A. Yes, cut at the base of the nose.

"Q. And that the nose was broken? A. In my judgment it was.

"Q. And that is caused by a heavy lick? A. Yes, caused by a lick I suppose.

"Q. A lick that hard on the back of the head could have caused death? A. It could have if the lick was hard enough."

State witness Walter Jones when asked by the Solicitor: "Mr. Jones tell the jury what you saw down there at that time," replied: "We were setting on the river bank fishing and while we were fishing we heard a motor start up the river about 75 yards, approximately that far. There were two men in this boat and it turned and started up and went back up the river. Between five and ten minutes later a body came floating down the river. We discovered it and naturally tried to catch it with our rods and reels. We threw our baits at in an effort to drag it into the bank. The wind was blowing and we couldn't catch it. Bill Privett, Jess Privett and George Hackworth went back up the river approximately a half mile or maybe a quarter to a mussel camp and brought the boat—borrowed a boat to come down the river and catch the body. In the meantime, myself and Edward Dobbins walked down the river watching the body until we came to a slough and we stood there and watched it until the boys came down the river and caught it and tied it up and we got in the car and went back to town and reported that we had found a body. We did that

and the sheriff came on down and got the body.

"Q. You and Dobbins stayed with the body? A. It was moving along down the river and we followed it down the bank.

"Q. You kept it in sight? A. Yes."

This witness further testified as to his experience with drowned persons. In this connection he was asked, "From your experience in searching for drowned bodies will you tell the jury what happens to the body when it is drowned in the water." He stated, "Naturally when a body drowns in the water it goes to the bottom."

It is clearly apparent, from the undisputed evidence in this case, that Woody, the deceased named in the indictment, had been killed. But it is likewise clearly apparent that said evidence fails to sustain the allegation in the indictment that he was killed by having been pushed or thrown into a river whereby he was drowned. As a matter of law the legal evidence in this case refutes the fact that Woody's death was caused by having been drowned.

It is unfortunate that the grand jury when deliberating upon this case should have confined its charge upon one single count. It is apparent that other and further counts could and should have been incorporated in the indictment to cover other phases of the evidence adduced. As stated in the outset, the defendants in this case were called upon to answer only the specific charge contained in the indictment and none other.

It has often, and advisably, been stated that the guilty, as well as the innocent, have a right to be tried in accordance with the law of the land. The innocent ought not to be punished, and the law does not intend or provide that they shall be punished; and as to the guilty, the law provides that such shall not be punished *except in the mode and manner provided by law.*

From what has been said, the judgment of the court below is reversed, and the appellant is discharged from further custody in this proceeding.

Reversed and rendered.